UNITED STATES DISTRICT COURT

DISTRICT OF MAINE

PROGRESS ENGINEERING, LLC,    )
    )
            Plaintiff,    )
    )
        v.    )        No. 1:22-cv-00257-LEW
    )
TODD M. BENNETT,    )
    )
           Defendant.    )

## ORDER ON MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

In this action, Plaintiff Progress Engineering, LLC, complains that one of its former employees, Defendant Todd M. Bennett, P.E., retained and perhaps disseminated proprietary, trade secret software applications following his resignation from employment, in violation of the parties' Employee Inventions, Confidential Information, Non-Competition and Non-Solicitation Agreement. The matter is before the Court on Plaintiff's request for a preliminary injunction, which relief the Court herein grants, in part.

### PROCEDURAL BACKGROUND

On August 22, 2022, Progress Engineering filed its Complaint (ECF No. 1) and an *ex parte* Motion for Temporary Restraining Order and Preliminary Injunction (ECF No. 5). A TRO is extraordinary in nature and never awarded as of right, particularly as it requests relief without giving the opposing party an opportunity to be heard. *Voice of the Arab World, Inc. v. MDTV Med. News Now, Inc.*, 645 F.3d 26, 32 (1st Cir. 2011); *Baber v. Dunlap*, 349 F. Supp. 3d 68, 74 (D. Me. 2018). Additionally, as of the date of the filing,

the controversy between the parties had already germinated for three weeks, with no cause to infer that the delay associated with allowing Defendant to respond would intensify the alleged harm to Progress Engineering.  Accordingly, on August 22, 2022, I denied the request for the TRO for lack of an immediate, irreparable emergency and ordered expedited briefing.  Order re Motion for TRO (ECF No. 10).  The briefing cycle ended on September 28, 2022.  However, on that date Progress Engineering filed a request for a non-testimonial hearing exclusively for purposes of oral argument.  Oral argument was then held on October 18, 2022.

## BACKGROUND

Progress is an electrical engineering firm located in Manchester, Maine, that specializes in creating process automation and control solutions for customers in the industrial sector.  Dana I. Hodgkin, P.E., is Progress's founder, sole member, and president. Most of Progress's customers are in the forest products industry.  For these clients, Progress typically designs, programs, builds, and installs software and hardware control and automation systems that include a Programable Logic Controller ("PLC").  The PLC systems control the operation of industrial machines (e.g., sawmills) to enhance their efficiency and productivity.  Part of the PLC systems Progress designs are so-called "optimizers."

Optimizers are specialized software programs used in the forest products industry to calculate where a piece of wood should be cut to maximize yield and minimize waste. An optimizer works by using a scanning system to generate data points about the wood's shape and other qualities and then processing the data to determine saw patterns for the

wood in question. Progress offers three different "off-the-shelf" optimizer products to its customers: EdgePRO™, TrimPRO™, and LogPRO™, each of which performs a different function with respect to the optimization of log cutting. Progress calls these three products the "OptiPRO suite."   While the OptiPRO suite is designed to be sold off-the-shelf, Progress works with customers who purchase these products to customize the products for their specific needs. Where changes to the "PRO" products are not sufficient to meet a customer's needs, Progress designs and implements bespoke optimizers for its customers. Progress's optimizer client base does not appear to be large, but each project tends to be a relatively demanding endeavor requiring significant engineering and software ingenuity.

The software source code behind the OptiPRO suite was developed over almost a decade, predominantly by Defendant, Todd Bennett, P.E.  Progress hired Bennett in 2011. Although Progress initially hired Bennett to perform the full range of work that Progress provides to its customers, over time Progress relied increasingly on Bennett to develop optimizer software for Progress and its customers. According to Progress, Bennett was Progress's sole employee with the expertise needed to develop and program Progress's optimizer products.[1]  In this role, Bennett frequently worked from home using a company laptop and peripheral equipment, including a hardware VPN, all of which Progress owned. When necessary, Bennett accessed Progress's shared network through credentials issued by Progress. Progress did not authorize its employees to download or store any of its

---

[1] At oral argument, Progress described Bennett as "instrumental" and "key" to its development of its optimizer software.  When Bennett joined Progress, he came with previous experience developing optimizer code for Maxi Mill Inc., a forestry products firm.  However, the OptiPRO suite is not a Maxi Mill software product and was developed over a course of years after Bennett no longer worked for Maxi Mill. Although Bennett suggests that Maxi Mill has ownership or originator status in his later work for Progress, at this stage of the proceedings it appears to be an unlikely contention on both factual and legal grounds.

software products on non-company, external, hardware devices.

Progress takes care in its employee and client relations to preserve its proprietary software products. In regard to clients, Progress licenses all its software programs to customers for use on a single-machine, single-location basis, rather than selling title to the code to its customers.  Under Progress's standard terms for a project, Progress remains the exclusive owner of any software, source code, or other information it creates in connection with the project.  Additionally, should anyone examine the software code they would find documentation at the beginning of each file stating that Progress is the owner of the code. Progress's standard terms also create mutual obligations to maintain a high level of confidentiality with respect to Progress's and its clients' respective proprietary information.

In regard to its employees, Progress similarly endeavors to maintain the confidentiality of its proprietary intellectual property.  Progress has only a small number of employees, all of whom are required to sign a confidentiality agreement and adhere to an employee handbook outlining security and confidentiality measures.  Progress requires its employees to regularly change their passwords and uses a third-party "password vault" application which adds a layer of security beyond a typical password requirement. Employees who wish to access Progress servers from off site are required to sign in over either a software program or a hardware VPN, both of which provide secure access to Progress's servers.  For security reasons, Progress restricts the use of the cloud for any of its data.  Progress purchases expensive computers with significant storage capacity for its employees to reduce the need to store information on additional devices, and Progress

employees are not permitted to store technical or customer data on any external devices.

As a condition of his employment, Bennett executed an Employee Confidential Information, Non-Competition and Non-Solicitation Agreement (the "Agreement") on January 16, 2011. By doing so, Bennett promised to:

(1) maintain the confidentiality of any of Progress's and its customers' trade secrets;

(2) use all reasonable precautions to ensure that any of Progress's trade secrets remain properly protected from disclosure to unauthorized persons;

(3) return all of Progress's tangible property, confidential information, and trade secrets upon the conclusion of his employment;

(4) refrain from using any of Progress's trade secrets for his own business or the benefit of any other person or entity;

(5) refrain from offering any service based on Progress's trade secrets;

(6) refrain from disclosing Progress's trade secrets to any other person or entity; and

(7) refrain from becoming employed by or providing any services to any current, former, or prospective client of Progress for a period of one year after the conclusion of his employment.

In addition, Bennett agreed that:

(8) all inventions, work, materials, improvements, concepts, or ideas on which Bennett worked or which Bennett created during the course of his employment or within 12 months after the termination of his employment, constitute the "sole and exclusive property" of Progress.

Agreement at 2-3 (paraphrased).

In January 2022, Defendant Bennett told Hodgkin that he had been speaking with Matthew Tietz of Wisconsin-based McDonough Manufacturing Company, a manufacturer of large-scale sawmill equipment. Bennett advised Hodgkin that McDonough, a Progress customer in 2018 and 2019 and a prospective customer, thereafter, was interested in

purchasing either Progress as a whole or certain of Progress's optimizer applications.

On May 23, 2022, Bennett also informed Hodgkin that McDonough had been trying to hire Bennett to work on developing optimizer technology for its sawmills. At this meeting, Hodgkin reminded Bennett that the Agreement restricted him from doing so without Progress's consent, which Bennett acknowledged. Bennett encouraged Hodgkin to reach a deal with McDonough where McDonough would purchase either Progress as a whole or Progress's optimizer technology and Bennett would be released to work for McDonough. Bennett also asked to transition to an hourly employment status with Progress where he would only work on discrete optimizer projects on an as-needed basis, which request Hodgkin granted. In a letter memorializing the terms of this new employment arrangement, Bennett acknowledged that his previously-executed Agreement continued to apply to his new position.

Hodgkin was interested in pursuing a deal with McDonough because he was beginning to consider retirement. However, following Hodgkin's provision of a preliminary price proposal for the sale of Progress's optimizer property[2], McDonough, on June 8, 2022, rejected the proposal.

On Thursday, July 28, 2022, Bennett arrived at a job site where Hodgkin was working for a customer and announced his intention to end his employment relationship with Progress. On July 29th, Bennett confirmed via text that he had resigned from Progress. In response, Progress shut off Bennett's network access and email and sent

---

[2] Progress never provided McDonough with any source code or other confidential information in connection with these discussions.

Bennett a termination letter.  Through the letter (ECF No. 7-7), Progress reminded Bennett of the confidentiality aspects of his Agreement and accused him of violating his Agreement by discussing employment with McDonough. Progress also asked Bennett to confirm, in writing, that he had returned all Progress software, code, and other materials, and that he had deleted all such information from his personal computers and memory storage devices. Progress included a "read and agreed to" signature line for Bennett, but Bennett declined to sign the letter, which he was under no obligation to sign.

After some back and forth, Bennett agreed to meet at the office on August 3, 2022 to return his Progress equipment. At the meeting, Bennett turned over his laptop, a wiped iPhone, and other equipment.  Bennett stated that Tietz had offered him a position at McDonough. Hodgkin stated that any work for McDonough would be a violation of the Agreement, given McDonough's interest in developing optimizer technology for its industrial sawmill products.  Bennett stated he was not currently doing any work for anybody, and that whether he ended up working with McDonough depended on Progress and McDonough making a deal.

Following this meeting, Progress reviewed the emails sent to and from Bennett via his Progress email account. That review uncovered email correspondence (ECF No. 7-12) reflecting that McDonough first offered Bennett employment on July 7, 2022, for which offer Bennett expressed appreciation, and that Bennet negotiated with McDonough concerning the specification of the computer he would require McDonough to obtain for him so that he would be able to work for McDonough on a contract basis. Among other email correspondence received by Bennett is an August 16, 2022 email from a McDonough

engineer (ECF No. 7-14) containing a spreadsheet of projects and noting that Bennett's anticipated contributions would involve machine logic and programming.

Based in part on these discoveries, Progress retained a digital forensics expert, James Berriman, to conduct a forensic examination and analysis of Bennett's laptop. Progress's expert determined that on July 28, 2022 at 4:51 p.m.—a few hours after announcing his resignation—Bennett attached a USB storage device to the laptop and copied the following five subfolders to that device:

> E:\Projects\DebarkOpt\;
>
> E:\Projects\LeatherstockingOpt\;
>
> E:\Projects\OptiPRO_V81\;
>
> E:\Projects\Tally.NET_40\; and
>
> E:\Projects\VNCViewer\.

Berriman Declaration (ECF No. 6). Each of the folder names matches a folder maintained and used by Progress and available to Bennett at that time either via the Progress network drive or through Bennett's offline copy of that drive. The five subfolders Bennett copied contain more than 3,900 total files consisting of Progress's proprietary intellectual property.

Berriman also determined that Bennett, on August 2, 2022, connected his Progress iPhone to his Progress laptop and performed an unauthorized back up onto USB-1, and on August 3, 2022, connected a different USB drive to the laptop and made another copy of the five subfolders listed above. According to Berriman, the forensic evidence strongly suggests Bennett may have pursued even more extensive copying efforts, which can be

confirmed only upon reviewing his devices.

The information contained in each subfolder has been summarized by Progress, as follows:

Projects\DebarkOpt: This subfolder contains documents concerning the research and development of a bespoke optimizer product produced and tested for Hardwood Products Company, LLC in Guilford, Maine, to improve its process of centering logs into a lathe. This folder contains the source code Progress prepared.

Projects\LeatherstockingOpt: This subfolder contains source code for a bespoke optimizer product Progress developed and has licensed to Leatherstocking Hand-Split Billet Co., an upstate New York company that produces "bat blanks" used to produce wooden bats used in Major League Baseball.

Projects\OptiPRO_V81\: OptiPRO is Progress Engineering's name for the suite of products that includes EdgePRO, TrimPRO, and LogPRO. This folder contains the source code for all three of Progress's core optimizer products.

Projects\VNCViewer\: The VNC viewer Visual Studio is a software application Progress developed for presenting optimizer data on a portion of a computer screen, without the requirement of a separate PC monitor. This folder contains the source code for the program.

Projects\Tally.NET_40\: This subfolder contains source code Progress developed to allow a PLC to interface with a production recording system. This database application stores information about sawmill production.

Hodgkin Declaration ¶ 43.

For obvious reasons, Progress is concerned that Bennett now possesses and may use or disseminate Progress's confidential and proprietary intellectual property, and that this situation presents a serious risk to Progress's existing business and prospects. Progress considers its optimizer products to be unique products that give Progress an edge in the industry and increase the overall value of the company.  In addition to maintaining that Bennett stands poised to violate the promises he made in his Agreement, Progress

maintains that Bennett has already violated the Agreement by accepting employment with McDonough.

For his part, Bennett declares (ECF No. 18-1) that he initially downloaded software from his Progress laptop to a personal hard drive to facilitate a backup of his iPhone. However, he also asserts that he held onto the software copies and made a backup on a flash drive in case he was asked to assist Progress employees with product development or troubleshooting.  Bennett also declares that he has since disposed[3] of the copies and has not transmitted any of the files at issue to any other individual or entity. Finally, Bennett declares that he is currently unemployed and never was employed by McDonough nor performed any services for McDonough.

## DISCUSSION

"To grant a preliminary injunction, a district court must find the following four elements satisfied: (1) a likelihood of success on the merits, (2) a likelihood of irreparable harm absent interim relief, (3) a balance of equities in the plaintiff's favor, and (4) service of the public interest." *Arborjet*, *Inc. v. Rainbow Treecare Sci. Advancements*, *Inc*., 794 F.3d 168, 171 (1st Cir. 2015).  As the party seeking injunctive relief, Progress bears the burden of establishing that the factors weigh in its favor.  *Nat'l Org. for Marriage v. Daluz*, 654 F.3d 115, 117, 119-20 (1st Cir. 2011).

### A.  Likelihood of Success

"Likelihood of success is the main bearing wall of the four-factor framework."

---

[3] At oral argument, Progress argued that Bennett engaged in spoliation of evidence if he destroyed any devices in his possession (such as a flashdrive) and that Progress should therefore have the benefit of favorable inferential findings.  It is not clear to me what findings I would make in the context of a motion for preliminary injunction that would militate in favor of greater relief than that provided in this Order.

*Ross-Simons of Warwick*, *Inc. v. Baccarat*, *Inc.*, 102 F.3d 12, 16 (1st Cir. 1996).  On this

issue "the district court is required only to make an estimation of likelihood of success and

'need not predict the eventual outcome on the merits with absolute assurance.'"  *Corp.*

*Techs.*, *Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013) (quoting *Ross–Simons*, 102 F.3d at

16).  Failure to demonstrate a likelihood of success of the merits is ordinarily dispositive.

*New Comm. Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002). On the

other hand, "[a]s a matter of equitable discretion, a preliminary injunction does not follow

as a matter of course from a plaintiff's showing of a likelihood of success on the merits."

*Benisek v. Lamone*, —— U.S. ——, 138 S. Ct. 1942, 1943–44 (2018) (per curiam). In the

final analysis, "trial courts have wide discretion in making judgments regarding the

appropriateness of such relief." *Francisco Sánchez v. Esso Standard Oil Co.*, 572 F.3d 1,

14 (1st Cir. 2009)).

In its Complaint, Progress alleges that Bennett has violated federal and state law

protecting trade secrets (Courts I and II) and breached his Agreement with Progress by,

inter alia, failing to preserve the confidentiality of Progress's intellectual property and

failing to not compete with Progress for a period of one year following his separation from

employment (Count III). Through its Motion (ECF No. 5), Progress argues it is likely to

prevail on its claims because the software in question is inherently subject to protection

under trade secret law and was misappropriated by Bennett, and because there is forensic

evidence proving that Bennett breached or likely breached his Agreement.

### 1.  Trade secrets

The federal Defense of Trade Secrets Act, 18 U.S.C. §§ 1836-1839 ("DTSA"),

grants the district courts of the United States original jurisdiction of civil actions involving the misappropriation of trade secrets related to a product or service used in, or intended for use in, interstate or foreign commerce. *Id.* § 1836(b)(1), (c). "To prevail on a claim of misappropriation of trade secrets, a plaintiff must show 1) the information is a trade secret; 2) the plaintiff took reasonable steps to preserve the secrecy of the information; and 3) the defendant used improper means, in breach of a confidential relationship, to acquire and use the trade secret." *Incase Inc. v. Timex Corp.*, 488 F.3d 46, 52 (1st Cir. 2007). The DTSA authorizes district courts to award monetary relief to the victim of actual trade secret misappropriation, measured by a plaintiff's actual loss, a defendant's unjust enrichment, or a reasonable royalty fee. 18 U.S.C. § 1836(b)(3)(B). But most germane to the present proceedings, district courts also are authorized to grant injunctive relief "*to prevent* any actual or *threatened* misappropriation" on reasonable terms, *id.* § 1836(b)(3)(A), though they generally may not "prevent a person from entering into an employment relationship" or otherwise burden an employment relationship based "merely on the information the person knows." *Id.*

Under the DTSA, the definition of "misappropriation" includes, inter alia, "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret." 18 U.S.C. § 1839(5)(B)(ii)(II). Similarly, the definition of "improper means . . . includes . . . breach of a duty to maintain secrecy" but not "independent derivation." *Id.* § 1839(6).

Finally, the term "trade secret" includes all forms of "engineering information, including . . . methods, . . . processes, . . . programs, or codes," if "the owner thereof has taken reasonable measures to keep such information secret" and "the information derives independent economic value . . . from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information." *Id.* § 1839(3). [4]

Based on the record available at present, I find that it is likely Plaintiff will be able to demonstrate a present and ongoing threat to its trade secrets. The fact finder likely would conclude that the products in question are deserving of trade secret protection given the effort Progress has taken to preserve them as such and based on the independent economic value the products have due to their not being generally known to, and not being readily ascertainable through proper means by, competitors and customers. The record also supports the finding that Bennett's duplication and retention of the software was unlawful given his promises to preserve and protect the software as Progress's confidential property. Although the record is less supportive of a finding that Bennett actually misappropriated trade secrets for the benefit of any third party, still the software code has economic value to Bennett as a freelance coder, so a fact finder might conclude that Bennett's duplication of the code and retention of it on personal devices was itself a misappropriation. Finally, the DTSA authorizes relief even in cases of threatened misappropriation, so the fact that Bennett now attests to disposing of his copies does not side step the need for injunctive

---

[4] The Maine Uniform Trade Secrets Act, 10 M.R.S. §§ 1541-1548, is to like effect, but it does not contain any language restricting (or promising) the availability of injunctive relief in restraint of employment. Both statutory schemes do specify, however, that they do not preempt or limit the availability of other legal remedies, such as contractual remedies. 19 U.S.C. § 1838; 10 M.R.S. § 1548(1)(A).

relief to reinforce Bennett's legal obligation not to misappropriate Progress's trade secrets. Given the overall circumstances, and given Bennett's furtive appropriation of the software code without disclosing the same to Progress, on or around the date of his resignation, I find that Progress is likely to succeed in its quest for injunctive relief based on the DTSA, at least in relation to the threatened misappropriation of software code and related files.

That leaves only the concern over Bennett's employment prospects. In a recent case involving the threat of disclosure associated with a former employee's move to a competitor, Chief Judge Jon Levy and Magistrate Judge John Nivison both concluded that "the inevitable disclosure doctrine does not apply to claims brought pursuant to DTSA." [5] *IDEXX Labs.*, *Inc. v. Bilbrough*, No. 2:22-cv-00056-JDL, 2022 WL 3042966, at *5-6 & n.4 (D. Me. Aug. 2, 2022), report and recommendation adopted, 2022 WL 4940200 (D. Me. Oct. 4, 2022) (dismissing case for injunctive relief where the plaintiff alleged that the defendant's new employment with a competitor would inevitably lead him to disclose trade secret(s) within his specialized ken). Because that conclusion disposed of the federal claim and a basis for diversity jurisdiction was not available, the court in *Bilbrough* did not reach the issue whether the Maine Supreme Judicial Court would apply the inevitable disclosure doctrine under Maine's Uniform Trade Secret Act. *Id.* at *6.

Like in *Bilbrough*, federal jurisdiction in this case is based on the presence of a

---

[5] "Pursuant to the inevitable disclosure doctrine, 'a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him [or her] to rely on the plaintiff's trade secrets.'" *IDEXX Labs.*, *Inc. v. Bilbrough*, 2022 WL 3042966, at *4 (D. Me. Aug. 2, 2022), report and recommendation adopted, 2022 WL 4940200 (D. Me. Oct. 4, 2022) (quoting *PepsiCo*, *Inc. v. Redmond*, 54 F.3d 1262, 1269 (7th Cir. 1995).

federal question. However, unlike in *Bilbrough*, Plaintiff alleges misappropriation of trade secret products existing in the form of software files, and since the DTSA authorizes district courts to prevent even threatened misappropriation, 18 U.S.C. § 1836(b)(3)(A), meaningful relief appears to be available under federal law. Thus, even if the DTSA would not authorize the injunctive relief Plaintiff requests concerning Defendant's future employment, it would afford relief associated with Defendant's software products.

Conceivably, Maine trade secret law might afford Progress relief related to future employment, but that is uncertain. Based on my research, no Maine state court has reached the issue and, in any event, the parties have not briefed the issue. Consequently, for present purposes the more likely route to injunctive relief related to Bennett's employment is Progress's breach of contract claim, to which I now turn.

### 2. Breach of contract

When Bennett accepted employment with Progress, he agreed to refrain from becoming employed by or providing any services to any current, former, or prospective client of Progress for a period of one year after the conclusion of his employment with Progress.[6] The restraint the Agreement imposes on Bennett's future employment prospects

---

[6] The Agreement recites this covenant in the following terms:

(d) For a period of one (1) year from the date of termination of his employment with the Company (whether initiated by Company or Employee and whether with or without cause), Employee will not, without the express prior written consent of Company, either directly or indirectly for himself or for any other person, whether as a principal, agent or employee, owner, partner, director, shareholder or independent consultant or through any corporation, partnership, or other entity (including without limitation, a sole proprietorship) (1) become employed by, engage or render services to any current, former or prospective client or customer of the Company regardless of geographic location, or to any person or entity that is engaged or intends to become engaged in consulting electrical engineering substantially similar to the Company's business within the Restricted Territory; (2) solicit, divert or

*(continued next page)*

is clear and unambiguous and Bennett has not offered any argument to the contrary.[7]

In Maine, "the reasonableness of a noncompetition covenant is a question of law that must be determined by the facts developed in each case as to its duration, geographic area, and the interests sought to be protected." *Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995). "Although Maine law does not permit non-compete agreements designed solely to prevent business competition," it generally allows them when they are designed "to preserve . . . trade secrets and other confidential information, including confidential product information, manufacturing processes and customer lists," provided that they are of reasonable duration and geographical impact. *Wausau Mosinee Paper Corp. v. Magda*, 366 F. Supp. 2d 212, 220 (D. Me. 2005).[8]   Even in such cases, courts will evaluate non-

---

accept, any current, former or prospective client or customer of Company regardless of geographic location, . . . .   For purposes of this Agreement, a "prospective client or customer" includes any person or entity to whom Company has provided a proposal or quote for services, with whom Company has been in communication regarding potential or proposed services, or who has been the subject of internal Company business development discussions and planning. Employee acknowledges and agrees that the restrictions in this paragraph are necessary and reasonable to protect the Company's Confidential Information and Trade Secrets, which are essential to the Company's business.

Agreement at 2-3, § 3(d) (ECF No. 7-2).

[7] The court looks "at the entire instrument when construing [a] contract and attempt[s] to give effect to all of its provisions," *Ackerman v. Yates*, 2004 ME 56, ¶ 10, 847 A.2d 418, 422, "avoid[ing] any interpretation that would render a contract provision meaningless, and interpret[ing] contract terms by reference to the plain meaning of the language used." *Combined Energies v. CCI, Inc.*, 628 F. Supp. 2d 226, 236 (D. Me. 2009).

[8] "Recognizing that the enforcement of an employee's covenant not to compete with his former employer has the potential for greatly restricting that employee's capacity to support himself in his chosen occupation, . . . such covenants 'are contrary to public policy and will be enforced only to the extent that they are reasonable and sweep no wider than necessary to protect the business interests in issue.'" *Chapman & Drake v. Harrington*, 545 A.2d 645, 646–47 (Me. 1988) (quoting *Lord v. Lord*, 454 A.2d 830, 834 (Me.1983)).

competition agreements to ensure that they "sweep no wider than necessary to protect the business interests in issue." *Lord v. Lord*, 454 A.2d 830, 834 (1983). Furthermore, "because the reasonableness of a noncompetition agreement depends on the specific facts of the case, [courts] assess the agreement only as [the plaintiff] has sought to apply it and not as it might have been enforced on its terms." *Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995). *See also Chapman & Drake v. Harrington*, 545 A.2d 645, 647 (Me. 1988) (same).

Based on the record as it now stands, a reasonable fact finder would likely conclude that Bennett breached a binding[9] non-competition covenant in his employment agreement by actively negotiating, if not consummating, contract employment with McDonough, one of Progress's past and prospective clients. The fact finder is also likely to find that Bennett's employment with McDonough would be a violation of the Agreement and that it would be reasonable to restrain the same, especially given the underlying circumstances precipitated Bennett's resignation from Progress and coincided with what appear to have been surreptitious efforts by Bennett to copy and retain Progress's trade-secret software code to enhance his ability to provide optimizer-specific coding services.

Equitable relief in the form of an injunction restraining Bennett from performing work for McDonough is available through an order requiring specific performance of those covenants in the Agreement that pertain to Bennett's future employment, provided that the denial of such relief would result in a threated irreparable injury to Progress. *Automatic*

---

[9] A non-competition agreement must be not only reasonable but also supported by consideration. "Under Maine law, '[e]mployment itself has been held to be a consideration for a noncompetition covenant in an employment contract.'" *Securadyne Sys.*, *LLC v. Green*, No. 2:13-cv-00387-DBH, 2014 WL 1334184, at *5 (D. Me. Apr. 2, 2014) (quoting *Brignull v. Albert*, 666 A.2d 82, 84 (Me. 1995)).

*Dialing Corp. v. Mar. Quality Hardware Co.*, 78 F. Supp. 558, 560 (D. Me. 1948); *Higgins v. Jenks*, 12 F. Cas. 127, 130 (C.C.D. Me. 1853).[10] Accordingly, I turn to the issue of irreparable injury.

## B. Irreparable Injury

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr.*, *Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). Based on my review of the record, Progress has satisfied me that withholding injunctive relief pending a final judgment in this matter would effectively deny Progress the benefit of its bargain with Bennett and threaten the kind of injury that could not be compensated adequately by an award of money damages or by a permanent injunction issued at the conclusion of the litigation.

Progress employed Bennett for a significant number of years in consideration of, among other things, Bennett's promises to preserve the products he developed as the

---

[10] Based on my review of the doctrine of specific performance, the traditional formula long used by Maine jurists sitting in equity to award specific performance of a contract was best summarized by Judge Ashur Ware in 1853:

> [T]he grounds on which courts of equity take jurisdiction to decree a specific performance of contracts, are, that a court of law can give for the breach of a contract no other remedy than damages; that in the particular case damages are an imperfect and inadequate remedy; that it is against conscience to leave to a party his election, either to pay damages for a voluntary breach of his engagements, or faithfully to perform them, and that it is unequal and unjust to the complainant to leave him to recover, by a suit at law, such damages as a jury may think proper to give him, in a case where the damages are uncertain and conjectural, instead of having the full benefit for which he has bargained by a specific execution of his contract. 2 Story, Eq. §§ 717, 719.

*Higgins v. Jenks*, 12 F. Cas. 127, 130 (C.C.D. Me. 1853).

confidential, proprietary property of Progress and, upon his separation from Progress, to refrain from competitive freelance work and other employment with a customer for a period of one year.  In his time with Progress, Bennett developed a suite of optimizer software products that appear to be of significant economic value, particularly in the hands of an electrical engineer and software developer like Bennett, who is equally capable of bringing the product to market as a freelance service provider as he is of doing so as an employee.  At least where, as here, there is such a close connection between the former employee's intangible skills and the tangible services and products on offer—services and products developed and refined through the employer's long-term investment—allowing the employee to walk away with the product utterly defeats the purpose of trade secret law and results in an injury distinct from the mere loss of future revenue to the employee.  For example, the employee could effectively transfer a unique product line from his employer's business to one or more third parties, an eventuality far more injurious and susceptible to characterization as incalculable than a mere loss of a few future transactions or customers that can be measured and remedied by a damages award.[11]

Similarly, in regard to Bennett's future employment prospects with McDonough, enforcement of a one-year non-competition agreement through a preliminary injunction is

---

[11] Progress characterizes the nature of its potential loss as a loss of reputation or goodwill and also suggests that some larger hazard looms for its customers if third parties are able to utilize its optimizer products. However, there is no evidence that any bespoke optimizer products developed for a customer are subject to an exclusivity agreement, and I am not persuaded on the existing record that dissemination of the optimizer products poses an existential threat to any Progress customer that participates in the local forest products industry. Also, this case is unlike *Ross-Simons of Warwick, Inc. v. Baccarat, Inc*., 217 F.3d 8 (1st Cir. 2000), because Progress still has in its possession the products of interest to this litigation. In other words, any concern over Progress's professional reputation or goodwill going forward is a personnel issue, since it still retains ownership of the software products and related files.

reasonable given the circumstances.  Those circumstances include a furtive effort to misappropriate copies of a product line that would be of great utility to McDonough combined with active pursuit of an employment relationship in which Bennett would provide optimization logic and programming services to McDonough.  Since McDonough is a former and prospective client of Progress,[12] Bennett's employment relationship with McDonough is foreclosed by the Agreement for a one-year period.  Absent enforcement through a preliminary injunction, limited to McDonough, the Agreement would be for naught.[13]

## C.  Balance of Equities

To obtain preliminary injunctive relief, a Plaintiff must also show "a balance of equities in [her] favor."  *Arborjet*, 794 F.3d at 171.  This involves weighing "the balance of relevant hardships as between the parties."  *Vaqueria Tres Monjitas, Inc. v. Irizarry*, 587 F.3d 464, 482 (1st Cir. 2009).  I have already discussed the equities as they concern Progress's interests.  Naturally, Bennett also has a significant stake in the outcome of this controversy.  However, the preliminary injunctive relief I provide to Progress is calibrated

---

[12] Bennett argues that the Agreement only restricts his ability to offer electrical engineering services, not software services.  Opp'n at 12 (ECF No. 18). However, the Agreement states that Bennett will not accept employment with a former or prospective client, without distinguishing between electrical engineering work and coding work (assuming for the sake of argument alone that this task distinction is material).  Agreement § 3(d).

[13] Progress initially requested injunctive relief barring any employment with "any current, former, or prospective client of Progress, including but not limited to McDounough . . ., for the duration of this litigation," and much more besides.  Motion at 19-20.  Progress backed off from that strident demand during oral argument, asking only for an order barring employment with either McDonough or Maxi Mill.  Because my order is calibrated to the exigencies raised in Progress's motion papers, I limit the non-competition relief to McDonough.  I also limit the duration of the injunctive remedy to one year, since that is the duration specified in the agreement and this litigation may not last so long.

to the situation at hand, *i.e.*: (1) the optimer software code and associated files and (2) employment with McDonough.  Certainly that leaves Bennett with a broad array of employment options to pursue, subject only to compliance with the Agreement.[14]  The balance of equities thus tips in favor of the award of injunctive relief set forth in the conclusion of this order.

### D.  Public Interest

"The public interest factor requires this Court to inquire whether there are public interests beyond the private interests of the litigants that would be affected by the issuance or denial of injunctive relief."  *Everett J. Prescott*, *Inc. v. Ross*, 383 F. Supp. 2d 180, 193 (D. Me. 2005)). Because the injunctive relief ordered herein is reasonable, it complies with the public's interest in the judicial policy requiring scrutiny and care when it comes to enforcing non-competition agreements.  Because "[t]here is no other public interest that counsels against granting injunctive relief," that concludes the public interest inquiry. *Securadyne Sys*., *LLC v. Green*, No. 2:13-cv-00387-DBH, 2014 WL 1334184, at *9 (D. Me. Apr. 2, 2014).

### CONCLUSION

Plaintiff Progress Engineering's Motion for a Preliminary Injunction (ECF No. 5) is GRANTED IN PART, as follows.

---

[14] Although I have calibrated the preliminary injunction to address present concerns, that does not relieve Bennett of the obligation to honor other reasonable applications of the Agreement's non-competition provisions.

For the period of one year, beginning July 29, 2022 and ending July 29, 2023, Defendant Todd Bennett will not provide any services to or accept any form of employment with McDonough Manufacturing Company.

Defendant is further enjoined to refrain from accessing, using, copying, disseminating, or making any use of any Progress software, digital files, and related documents, and to immediately and permanently dispose of and destroy any of the same that might be in his possession. This includes all optimizer software and files developed by Bennett or other Progress employees during Bennett's employment with Progress but does not apply to optimizer software and files as they existed when Bennett commenced employment with Progress.

Defendant is further enjoined to file a declaration within 14 days of this order specifying the details of his personal[15] possession and disposition of any of the software, files and related documents identified in the previous paragraph, including a statement whether he disseminated the same to any other individual or entity and, if so, when and to whom.

Defendant is further enjoined to produce the personal electronic devices in his possession or subject to his control for forensic examination to independently assess the extent of any copying of the subject materials and to ensure the permanent deletion of the subject materials, the details of which forensic process—including assignment of costs— will be determined and set forth by Magistrate Judge Wolf following a conference of

---

[15] By personal possession and disposition I mean activity conducted outside of the ordinary processes necessitated by and associated with Bennett's work for Progress.

counsel.

**SO ORDERED.**

Dated this 3rd day of November, 2022.

/s/ Lance E. Walker
UNITED STATES DISTRICT JUDGE
